955 P.2d 21

In re the Marriage of Louise A.
MUCHESKO, Petitioner–
Appellee,

v.

Samuel MUCHESKO, Respondent–
Appellant.

No. 1 CA–CV 96–0459.

Court of Appeals of Arizona,
Division 1, Department E.

Sept. 30, 1997.

Reconsideration Denied Jan. 8, 1998.

Review Denied May 19, 1998.

266

Favour Moore & Wilhelmsen, P.A. by Mark M. Moore and Thomas M. Stoxen, Prescott, for Petitioner–Appellee.

Musgrove, Drutz & Kack, P.C. by Mark W. Drutz, Grant K. McGregor and John G. Mull, Prescott, for Respondent–Appellant.

## OPINION

THOMPSON, Presiding Judge.

Samuel Muchesko (Husband) appeals from the decree of dissolution distributing the parties' property, ordering that Husband pay child support based on an annual income of $131,000.00, awarding Louise A. Muchesko (Wife) half of Husband's monthly retirement

benefits and her attorneys' fees, and from the trial court's denial of his motion to quash a lis pendens that Wife filed against the parties' Prescott house. For the reasons stated below, we reverse the property division, the lis pendens and the award of attorneys' fees to Wife and remand for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

Husband and Wife were married in 1979 and lived in Pennsylvania until June 1994, when they moved to Arizona. Husband was a school teacher who retired in 1993. Wife did not work outside the home except for her part-time business trading antiques. The parties separated in June 1990, and Wife filed for divorce in Pennsylvania in November 1990. Between June 1990 and June 1994, the parties made several attempts to reconcile, all of which failed.

At no time between June 1990 and June 1994 did the parties live together. In an attempt to reconcile, in April 1991, the parties decided to purchase a house in Hartstown, Pennsylvania. Wife put down $1,000.00 earnest money on the Hartstown house. However, just before closing, Husband changed his mind, the sale was never completed, and Wife forfeited the earnest money.

In June 1991, the parties discussed a property settlement, and in August 1991, Husband prepared a document setting forth what he thought were the terms of their agreement. Wife refused to sign Husband's proposed agreement, and took the document to her attorney who prepared a more formal settlement agreement with terms more favorable to Wife.

Wife gave the settlement agreement to Husband, who signed it on September 18, 1991 and returned it to Wife. Wife put the agreement in a drawer and did not look at it for over a year. Between June 1991 and January 1992, Husband paid Wife a total of $50,000.00 and reimbursed her for the $1,000.00 earnest money she lost on the Hartstown house. Wife used some of this money to purchase two houses in Greenville, Pennsylvania. She took title in her name only, lived in one of the houses with the parties' two children, and rented the other.

In early 1994, the parties voluntarily dismissed the Pennsylvania divorce action in an attempt to reconcile. They purchased a home in Prescott and moved to Arizona in June 1994. The parties lived as husband and wife until late August 1994, when Husband returned to Pennsylvania to be with his sick mother. He came back to Prescott briefly and again returned to Pennsylvania to seek psychiatric help for depression. Husband returned to Prescott in early November 1994, and Wife filed this dissolution action on November 7, 1994.

After a three-day bench trial, the trial court found that there was no binding settlement agreement between the parties and divided the property and debts according to Arizona's community property laws. The court awarded Wife spousal maintenance of $1,000.00 per month for 24 months, child support of $953.25 per month, and $16,176.00 in attorneys' fees. Wife was awarded the two Greenville houses; a Schwab stock account worth $142,044.00 or its current balance, if greater; a Paul Revere annuity; half of Husband's monthly retirement benefits; a 1994 Honda; antiques in her possession worth approximately $15,000.00; and personal property in her possession. Husband was awarded the Prescott house with equity of $223,500.00, subject to a $10,500.00 lien for Wife's share of community funds Husband dissipated; a Schwab IRA account worth $40,177.00 or its current value, if greater; interest on the Paul Revere annuity through the first quarter of 1995; half of the monthly retirement benefits; a 1994 Blazer; and personal property in his possession.

Husband filed a motion for new trial, which the trial court denied. The court entered a stipulated amended decree, and Husband filed a timely notice of appeal. We have jurisdiction over Husband's appeal from the decree and denial of his motion for new trial pursuant to Ariz.Rev.Stat. Ann. (A.R.S.) § 12–2101(B) and (F).

## DISCUSSION

### I. Settlement Agreement

#### A. Application of Pennsylvania Law

Husband contends that the trial court erred in applying Arizona law to determine whether the parties had entered into a binding settlement agreement. He contends that Pennsylvania law applies. Although Husband made this argument below, he did not cite any Pennsylvania authority to the trial court. Husband only cited Arizona law to support his claim that the parties had a binding settlement agreement. On appeal, Husband cites Pennsylvania law for the first time in his reply brief. Issues raised for the first time in the reply brief will not be considered. *Anderson v. Country Life Ins. Co.,* 180 Ariz. 625, 886 P.2d 1381 (App.1994). Furthermore, we need not rely on Pennsylvania law to find an agreement here.

#### B. Parties' Conduct

■ Husband contends that the trial court erred in concluding that the parties did not reach a binding settlement agreement in 1991. He contends that the parties acted consistently with the terms of the settlement agreement that Wife's attorney prepared and, therefore, should be bound by the agreement. The trial court found that during the parties' Pennsylvania separation, they reached an agreement as to the division of some of their property, but because Wife never signed the settlement agreement her attorney prepared, there was no binding settlement agreement.

We are bound by the trial court's findings of fact unless they are clearly erroneous. *Burnette v. Bender,* 184 Ariz. 301, 304, 908 P.2d 1086, 1089 (App.1995). The existence of an implied contract is a question of fact where the evidence is conflicting. *Wagenseller v. Scottsdale Mem'l Hosp.,* 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985). "We are not bound, however, by the trial court's conclusions of law nor findings that combine both fact and law when there is an error as to the law." *Lee Dev. Co. v. Papp,* 166 Ariz. 471, 476, 803 P.2d 464, 469 (App.1990). We conclude the trial court erred in determining that there was no binding settlement agree-

ment merely because Wife failed to sign the agreement.

To establish a binding settlement agreement, Husband must establish all elements of a valid contract. *See Malcoff v. Coyier,* 14 Ariz.App. 524, 526, 484 P.2d 1053, 1055 (App. 1971). The essential elements of a valid contract are an offer, acceptance, consideration, a sufficiently specific statement of the parties' obligations, and mutual assent. *Savoca Masonry Co., Inc. v. Homes & Son Constr. Co.,* 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975).

The fact that Wife did not sign the contract does not preclude a finding of a valid contract. Courts may look at the writing, the conduct of the parties, and the surrounding circumstances in deciding whether a contract existed or whether a meeting of the minds occurred. *Malcoff,* 14 Ariz.App. at 526, 484 P.2d at 1055. A finder of fact may conclude that a contract exists based solely on the parties' conduct. *Cook v. Cook,* 142 Ariz. 573, 576, 691 P.2d 664, 667 (1984). Although the failure of one party to execute an instrument usually renders it incomplete, "where all the parties, including the nonsigners, by their actions recognize the validity of the agreement and acquiesce in its performance," a contract may exist. *Modular Sys., Inc. v. Naisbitt,* 114 Ariz. 582, 585, 562 P.2d 1080, 1083 (App.1977). In deciding whether this mutual assent exists, we look at objective evidence, not "the hidden intent of the parties." *Id.*

"An offer is '. . . a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' Restatement (Second) of Contracts § 24." *K–Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n,* 139 Ariz. 209, 212, 677 P.2d 1317, 1320 (App.1983). In June 1991, the parties began discussing the division of their property and assets. Husband prepared a proposed agreement dated August 21, 1991. Wife disagreed with some of its terms and took the agreement to her attorney who prepared a "Separation and Property Settlement Agreement." Wife delivered this settlement agreement to Husband, who signed it on September 18, 1991,

and returned it to Wife. The parties then did not discuss the agreement for over a year.

We conclude that by delivering a formal settlement agreement prepared by her own attorney, Wife made an offer to Husband, which he accepted by signing and returning it to her. Wife had rejected Husband's proposal and proposed an agreement with terms more advantageous to her. Husband had no reason to believe Wife did not approve of the terms of her own proposed agreement. Wife did not indicate that the agreement was conditional or that she did not approve of its terms.

Wife claims she did not intend to make an offer because she had rejected Husband's proposed agreement and the agreement prepared by her attorney contained substantially similar terms. We disagree. Wife's proposed agreement contained two terms significantly more advantageous to Wife. She received $6,000.00 more for her interest in the Hermitage house, and Husband accepted all liability for the failed Hartstown deal. Based on the objective evidence, Wife made an offer to Husband, which he accepted by signing the agreement and returning it to Wife. *See K–Line Builders,* 139 Ariz. at 212, 677 P.2d at 1320 ("acceptance is '... a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.' Restatement (Second) of Contracts § 50").

■ "Consideration is a benefit to the promisor or a loss or detriment to the promisee...." *K–Line Builders,* 139 Ariz. at 212, 677 P.2d at 1320. "A promise for a promise is adequate consideration." *Id.* Both parties received certain assets and property and undertook certain obligations. Accordingly, there was adequate consideration.

■ Wife's offer also contained sufficiently specific terms to determine the parties' obligations. *See id.* The agreement detailed the property, assets, and liabilities to be divided and addressed other material terms

such as spousal support, attorneys' fees, custody, child support, and provided remedies in case of default.

■ We next consider whether the parties' conduct established mutual assent to the terms of the agreement. After the parties began negotiating a property settlement, Husband paid Wife $1,000.00 to reimburse her for the earnest money she lost on the Hartstown property. Despite the fact that the agreement provided for the $1,000.00 reimbursement, Wife contends that Husband only reimbursed her because she had filed a lawsuit against Husband for reimbursement or to force the sale.

The settlement agreement allocated Husband's retirement income and the "investment accounts."[1] Under the agreement Wife was entitled to the $38,000.00 in the joint Paine Webber account already in her possession. Wife received that money in August 1991, during the settlement negotiations. A note dated November 25, 1991, and signed by both Husband and Wife documents their request that their mutual Schwab account be closed and the assets transferred to Husband's sole account.

Wife testified that she removed $45,000.00 worth of antiques and furniture from the Hermitage house in March 1991. The agreement provided that Wife was to remove additional antiques from the Hermitage house. Wife claimed that she was never allowed to do so. Although the removal of the antiques and furniture pre-dated the settlement negotiations, Wife always treated the property as if it were her separate property. She sold some antiques and property in her possession and kept the proceeds for living expenses. This conduct manifests a belief that this was her separate property.

Wife also bought two houses in Greenville and took title in her name only. She kept the rental income from one of the houses for herself. Additionally, the parties filed separate tax returns in 1991, 1992, and 1993. These facts also manifest a belief that the

1. The settlement agreement states: *"Investment Accounts.* Wife shall retain the cash from the Paine Webber account in the amount of Thirty-eight Thousand ($38,000.00) Dollars currently in her possession. Wife shall waive any and all interest in the Paul Revere annuity owned by Husband, and the net value of all stocks owned by Husband."

parties were dealing with their separate property.

On September 18, 1991, Husband signed the settlement agreement. After Husband signed the agreement, Wife left the agreement in a drawer for over a year. Pursuant to the agreement, Husband was to pay Wife $50,000.00 for her interest in the Hermitage house. Between August 1991 and January 1992 Husband paid Wife a total of $50,000.00. On the back of the first check, next to Wife's endorsement, she noted a balance due of $26,000.00. The last check Wife cashed had "divorce settlement paid in full" written on it. Objectively, it appears that these payments were made and accepted pursuant to the terms of the settlement agreement. Wife never indicated otherwise when she received the money.

■ In November 1991, Wife signed two documents Husband had prepared which removed Wife from the deed to the Hermitage house and from the parties' joint Schwab account. Wife contends, however, that she signed these documents because she feared Husband's reaction if she refused. Wife believed the documents had no legal effect and did not intend to effect any transfers by signing the documents. Mutual assent is based, however, on the objective evidence, not on Wife's subjective intent. *See Hill–Shafer Partnership v. Chilson Family Trust*, 165 Ariz. 469, 474, 799 P.2d 810, 815 (1990).

Ultimately, Wife's name remained on the deed to the Hermitage house. The parties disputed when Wife's name was removed from the Schwab account. Wife claimed it was not removed until December 1994. However, Husband provided a Schwab statement showing that in December 1991, Wife was no longer on the account.

Wife claimed that the terms of the agreement that were not performed were that (1) Husband failed to pay off the 1989 van, (2) he did not provide medical insurance for the parties' two children, (3) she was not allowed to remove additional antiques from the Hermitage house, and (4) her name was never removed from the Schwab account. In the spring of 1992, after Husband had paid Wife $51,000.00, Wife declared there was no settlement agreement because she never signed it.

The Pennsylvania court held a hearing to determine the effect of this agreement. However, in January 1994, the parties mutually agreed to dismiss the Pennsylvania divorce proceedings before the issue was resolved.

In 1994, the parties decided to move to Prescott, Arizona and live as a family. In April 1994, the parties took out a loan on the Hermitage house to help pay for the Prescott house. Both Husband and Wife were still on the deed to the Hermitage house and both signed the loan documents. The parties took title to the Prescott house as joint tenants.

In Arizona, the parties opened a joint checking account into which they deposited Husband's retirement income and Wife's rental income from her Greenville houses. The parties also incurred joint obligations in Arizona. They took out a line of credit on the Prescott house to pay off Wife's car and a loan Husband took out to pay Wife $25,-000.00 in 1991. The parties also filed a joint tax return in 1994. However, they treated some of their personal property as separate property.

The parties' conduct in Arizona in 1994 was contrary to the 1991 settlement agreement, which provided that the parties would close all joint accounts, Husband would keep his retirement income separate, and the parties would not incur any community debt. Wife contends the parties reconciled, thereby negating the effect, if any, of the settlement agreement.

■ "Reconciliation is the voluntary resumption of a marital relationship in the fullest sense, and is a state of mind to be determined by the evidence." *Miller v. Miller*, 189 Mont. 356, 616 P.2d 313, 316 (1980). In determining whether a reconciliation has occurred, courts look at whether the parties have resumed cohabiting, sexual relations, and the maintenance of joint affairs as husband and wife. *Id.* To effect a revocation of a settlement agreement, the parties must intend to resume married life "completely and entirely" and not just temporarily or for a trial period. *Id.*

Here the trial court stated that "[t]here being no ... binding property agreement, when or whether the parties reconciled their marriage is of no consequence," and therefore did not reach the issue of reconciliation. Because we have found a binding agreement and there is evidence which could reasonably support a finding of reconciliation based on the parties' conduct in Arizona in 1994, we move on to consider the effect a finding that the parties had reconciled would have on their agreement.

## C. Effect of Reconciliation

■ Husband argues that despite any reconciliation, the court should have enforced the settlement agreement to the extent it had been performed. We agree. Whether a reconciliation operates to annul a separation agreement " 'depends on the intention of the parties as shown by their acts.' " *Smith v. Smith,* 71 Ariz. 315, 319, 227 P.2d 214, 216 (1951) (citing 40 A.L.R. 1227, 1231, 85 A.L.R. 420, 421). In *Smith,* the parties entered into a property settlement and, on the same day, filed for divorce. *Id.* at 317, 227 P.2d at 215. They soon thereafter resumed cohabitation and wife dismissed the divorce action. *Id.* The Smiths took no steps to carry out the terms of the agreement. *Id.* at 319, 227 P.2d at 216. Several months later Wife refiled for divorce. *Id.* at 316–17, 227 P.2d at 215. The court concluded that the parties did not consider the agreement valid after the first action was dismissed. *Id.* at 319, 227 P.2d at 216–17. The Smiths did nothing to carry out the agreement and never recorded the agreement. *Id.* The agreement contained no words of transfer or conveyance and was, therefore, intended only to form the basis of a decree made in the first action. *Id.*

Conversely, the Mucheskos carried out several provisions of their agreement prior to their 1994 reconciliation. Their conduct between June 1991 and June 1994 indicates a belief that the agreement was binding. Although they never filed the agreement with the Pennsylvania court, in the fall of 1993 there was a hearing to determine the effect of the settlement agreement. The parties, however, ultimately dismissed the Pennsylvania proceedings.

In *Miller,* a Montana court held that a reconciliation does not abrogate the executed terms of a previous settlement agreement. 616 P.2d at 317. The Colorado appellate court has also held that "[w]here property settlement provisions have been fully executed prior to reconciliation, they are presumed to be valid and binding, and the burden of proving abrogation is on the party seeking to nullify the executed portions of the property agreement." *In re Marriage of Reeser,* 635 P.2d 930, 932 (Colo.App.1981).

The Mucheskos acted as if they were separated and substantially performed under the terms of the settlement agreement for over three years. Wife accepted $51,000.00 from Husband, took $38,000.00 from their joint Paine Webber account, and $45,000.00 worth of antiques. Both maintained completely separate residences and finances during that time. Husband received no interest in her rental income or the proceeds from the sale of antiques and pontoon boat. The parties' property was divided according to the terms of the settlement agreement, and the parties continued to treat it as their separate property until they decided to move to Prescott in June 1994.

Property distributed under the terms of the 1991 settlement agreement should remain each party's separate property unless there is evidence that the separate property was transmuted to community property by commingling, gift, agreement, or otherwise. Thus, any reconciliation would not annul those provisions of the settlement agreement which had been performed. Accordingly, the decree of dissolution is reversed and remanded for further proceedings consistent with this decision.

## II. 1994 Capital Gains as Income to Husband

■ The trial court found Husband's income in 1994 was $131,000.00. Husband claims the court erred in attributing a one-time capital gain of $99,766.00 as part of his 1994 income. This issue presents mixed questions of fact and law, and we will accept the trial court's findings of fact unless clearly erroneous and draw our own legal conclu-

sions based on those facts. *Burnette v. Bender*, 184 Ariz. at 304, 908 P.2d at 1089.

The trial court found that Husband is a "very sophisticated investor" and "has used his talents, skills, and expertise and has generated substantial income and profit by buying[,] selling, and trading stocks in the equities market." Husband testified that in 1994, he sold stocks from his Schwab stock account for the purchase of the Prescott house and realized capital gains of $99,766.00. Husband claims this was a one-time event and the capital gains should not be considered income for purposes of determining his child support obligation. Husband relies on *Burnette v. Bender*, in which this court held that capital gains do not represent gross income for child support purposes in some cases. 184 Ariz. at 305, 908 P.2d at 1090.

In *Burnette*, the father owned a boat and worked part-time as a commercial fisherman. *Id.* at 303, 908 P.2d at 1088. He sold the boat and fishing license for $150,000.00, which he claimed as a capital gain. *Id.* After paying taxes, the father invested $100,-000.00 in an annuity. *Id.* The trial court refused to include the $100,000.00 in the father's income because the "sale was a one time event and the Father will not receive additional capital gains from this asset." *Id.* The trial court did, however, include as income the interest the father would earn on the annuity. *Id.*

However, we need not apply *Burnette* to sustain Husband's claim of error in the imputation of capital gains income to him. The trial court awarded the Schwab stock account to Wife. This was doubly erroneous, in that, first, earnings gained from the Schwab account could not support the attribution of present income when the account was award-ed to Wife,[2] and second, this account appears to have been Husband's separate property under the settlement agreement.

 Husband contends that his capital gains for 1994 were "extraordinary" and, therefore, should neither be considered income for child support purposes nor imputed as future earnings. Certainly, an award must be based on present conditions and "not made to depend on uncertain contingencies or hypothetical earnings or income." *Brevick v. Brevick*, 129 Ariz. 51, 54, 628 P.2d 599, 602 (App.1981). On remand, evidence may be available on whether Husband's 1994 capital gains were so historically "extraordinary" as to be without value in imputing future earnings. *See Scott v. Scott*, 121 Ariz. 492, 494, 591 P.2d 980, 982 (1979) (finding temporary or speculative change in earnings is insufficient to support a modification).

We have remanded for redetermination of the property distribution. The stocks appear, on this record, to have already been allocated and assigned to Husband under the settlement agreement. Should this be borne out on remand, capital gains may be attributed to Husband as present income subject only to the principles enunciated in *Brevick* and *Scott*.

## III. Retirement Benefits

 The settlement agreement allocated the entire amount of retirement benefits to Husband. Absent a transmutation of this property it remains Husband's separate property. At a minimum, even if the trial court determines that Husband's retirement became a community asset as a result of reconciliation of the parties, the division of the benefits must be recalculated.[3]

---

2. At the very least, attributing an income to Husband based on an asset awarded to Wife invites an immediate petition to modify. The better approach is to consider the parties' financial resources awarded in the decree. *See* A.R.S. § 25–320(A) (in determining child support obligations, court should consider financial resources of the parties); *Baum v. Baum*, 120 Ariz. 140, 146, 584 P.2d 604, 610 (App.1978) (not improper for court to consider assets awarded to Wife in determining the amount of spousal support).

3. The trial court awarded Wife half of Husband's monthly retirement benefits. Husband worked as a teacher from 1968 to 1970 and from 1974 through 1993, when he retired. The parties were married on December 22, 1979. Thus, Husband worked for 6.5 years prior to marriage and for 14.5 years during the marriage. The trial court concluded that Husband did not establish the amount of benefits he had earned prior to marriage and divided the retirement benefits equally. Although Husband did not know the value of his retirement benefits in 1974, he testified that his benefits related to all of his previous

■ All property acquired during marriage, except by gift, devise, or descent, is community property. A.R.S. § 25–211. Retirement benefits earned during marriage by community effort are community property. *Van Loan v. Van Loan*, 116 Ariz. 272, 273–74, 569 P.2d 214, 215–16 (1977). Wife has a community interest only in those benefits earned during the marriage.

We vacate the award to Wife of half of Husband's monthly retirement benefits and remand for proceedings consistent with this opinion.

## IV. Attorneys' Fees

■ The trial court awarded Wife attorneys' fees in the amount of $16,176.00. Section 25–324 sets forth the framework for awarding attorneys' fees in dissolution cases. At the time of trial and all post-trial motions, A.R.S. § 25–324 focused solely on the parties' relative financial resources.[4]

The trial court specifically considered the parties' financial resources and found that throughout the litigation, Husband's resources and ability to generate income were "substantially" greater than Wife's. During trial, Husband had access to the Schwab stock account and his annuity account. In 1995, he withdrew over $60,000.00 from the Schwab stock account. Wife, however, incurred substantial credit card debt to pay her living expenses. Husband was ordered to pay Wife $1,200.00 per month for spousal maintenance *pendente lite.*

Husband claims, however, that Wife was awarded sufficient assets in the decree to allow her to pay her own attorneys' fees. Husband's argument focuses solely on the Wife's post-decree financial resources. The trial court found a significant pre-decree disparity between the parties' financial resources and relied on this finding in making an award of Wife's attorneys' fees. *See Kelsey v. Kelsey*, 186 Ariz. 49, 54, 918 P.2d 1067, 1072 (App.1996).

On appeal, we generally will not disturb an award of attorneys' fees absent an abuse of discretion. *Hrudka v. Hrudka*, 186 Ariz. 84, 94–95, 919 P.2d 179, 189–90 (App.1995). Given that wife had significant assets both before and throughout these proceedings, we are unpersuaded that *Kelsey* would support this fee award. Indeed, since any fee award will be paid out of post-decree assets and income, the exclusive focus on pre-decree financial resources is insupportable, *Kelsey* notwithstanding. Further, because our decision substantially alters the status of the decree as written, the issue of attorneys' fees should be revisited by the trial court. We make no award of fees or costs incurred on appeal.

## V. Lis Pendens

■ The trial court entered its initial decree on March 21, 1996, awarding the Prescott house to Husband. Wife subsequently filed a notice of lis pendens, in which she claimed the dissolution action constituted an action affecting title to or interests in the Prescott house. Husband moved to quash the lis pendens. Wife argued that the dissolution action affected title to real property because in post-decree motions she asked the court to award her the Prescott house. The trial court denied the motion to quash.

Although "[t]he denial of a motion to quash [a lis pendens] is not an appealable order," courts may grant relief by way of special action where the trial court abused its discretion in denying the motion to quash. *Tucson Estates, Inc. v. Superior Court*, 151 Ariz. 600, 602–03, 729 P.2d 954, 956–57 (App.1986). Husband appealed from the signed order

---

employment and that he received credit for every year of teaching he had. Wife did not dispute Husband's testimony regarding the dates he was employed. We conclude that this testimony is sufficient to establish that Husband earned benefits for each of the 21 years he taught. Accordingly, the trial court erred in awarding Wife half of all Husband's monthly retirement benefits where the parties were only married for 14.5 of the 21 years Husband earned benefits. Husband's monthly benefits are $1,952.79. Under the above scenario the community would be entitled to 69% of these benefits, or $1,347.43; Wife's share is $673.71.

4. A.R.S. § 25–324 was subsequently amended to allow courts to consider the reasonableness of a party's legal position. A.R.S. § 25–324 (Supp. 1996).

274

denying his motion to quash, but did not file a special action.

Not wanting to elevate form over substance, we exercise our discretion to treat this portion of the appeal as a special action and address the merits. *See Arvizu v. Fernandez,* 183 Ariz. 224, 227, 902 P.2d 830, 833 (App.1995).

■ Arizona Revised Statutes § 12–1191(A) authorizes the filing of a lis pendens in any action "affecting title to real property." The issue before us is whether this dissolution action constituted an action "affecting title to real property." At the time Wife filed the notice of lis pendens, there was a decree awarding the Prescott house to Husband. Prior to filing the lis pendens, Wife also filed a motion to alter or amend the decree to provide that if Husband did not turn over the proceeds of the Schwab account in 30 days, the court would enter judgment divesting Husband of title to the Prescott house and conveying title to Wife. Wife claims that based on this motion, the dissolution action constituted an action affecting title to the Prescott house.

"It is well established that a lis pendens may not be predicated on an action or suit for money judgment but applies only to an action or suit which directly affects the title to real property." *Coventry Homes, Inc. v. Scottscom Partnership,* 155 Ariz. 215, 217, 745 P.2d 962, 964 (App.1987). Wife sought to have the court award her the house to satisfy the previous award of the Schwab account. This does not turn the dissolution action into an action affecting real property. Wife's motion to amend or alter the decree was more akin to an action on a debt. Filing a lis pendens on an action for a debt is improper. *See Mammoth Cave Prod. Credit Ass'n v. Gross,* 141 Ariz. 389, 392, 687 P.2d 397, 400 (App.1984). Accordingly, the trial court abused its discretion in failing to quash the lis pendens. *But see Hoyt v. American Traders, Inc.,* 301 Or. 599, 725 P.2d 336, 341 (1986) (filing of petition for dissolution involving a claim for an award or division of real property is an action affecting title to real property).

## CONCLUSION

We reverse and remand this matter for redetermination of the property distribution in light of the terms of the settlement agreement that were fully performed prior to the parties' move to Arizona. Among other issues to be retried, the trial court shall reconsider the award of the Schwab account and attribution of income to Husband based on that account. We reverse that part of the decree awarding Wife half of Husband's monthly retirement income. We reverse the award of attorneys' fees to Wife; on remand this issue should be reconsidered. We reverse the trial court's denial of Husband's motion to quash the lis pendens, and direct that the lis pendens be quashed.

PATTERSON and LANKFORD, JJ., concur.